UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY STEPHENS,

                    Plaintiff,                     Case No. 05-72585

vs.

                                  HONORABLE GEORGE CARAM STEEH
JO ANNE B. BARNHART,               MAGISTRATE JUDGE STEVEN D. PEPE
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

_____/

**REPORT AND RECOMMENDATION**

**I.     BACKGROUND**

      Gary Stephens brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying his application for Disability Insurance Benefits (DIB) under Title II.  Both parties have filed motions for summary judgment which have been referred for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and (C).  For the following reasons, it is Recommended that Plaintiff's motion for summary judgment be GRANTED and Defendant's motion for summary judgment be DENIED, and this matter be REMANDED for further proceedings consistent with this report.

     **A.     Procedural History**

      Plaintiff applied for DIB on December 31, 2001, alleging that he had became disabled on November 24, 1997, due to pain in his right shoulder, elbow and arm (R. 48, 50, 62).  He amended, his alleged onset date to May 8, 1999, at the hearing on this matter (R. 17, 238).  Plaintiff's application was denied initially and on May 10, 2004, following a hearing before Administrative Law Judge Douglas N. Jones (ALJ Jones) (R.14-25).  The Appeals Council

denied Plaintiff's request for review (R. 4-6).

B.   **Background Facts**

1.   *Plaintiff's Testimony*

In his *Pain Questionnaire* Plaintiff indicated that the types of activities that cause pain and how long it lasts "varies", but that his condition does not affect his ability to walk (R. 85-86). Plaintiff claimed that he always has pain and his medications, which included Oxycontin, Tylenol #3, Zanaflex and Celebrex, did help "sometimes", but caused him to be tired.  Plaintiff also received acupuncture to reduce the pain.

Plaintiff kept a *Daily Activity Sheet* for 3 days and reported spending the majority of his time in bed and watching television (R. 101-103).  He made one trip to the doctor's office and did not leave the house for the remainder of those 3 days.

At his hearing Plaintiff testified about his pain in both shoulders, neck, right elbow, and lower back and his diabetes (R. 245-248).  He took pain medications daily and experienced side effects of drowsiness, dizziness, problems concentrating, and headaches.  His conditions had worsened since May 1999 and his pain medications had increased (R. 249).

Plaintiff's only surgery was his right elbow in 1998 and on his right shoulder in 1999 (R. 245, 254-255).  He did home exercises for his shoulder about one day a week, "when I can…due to the pain levels that I have."

Plaintiff received cortisone shots for neck pain that radiated to both shoulders; this was caused by using the left shoulder and arm more than the right due to pain in his right side (R. 247-248).  Plaintiff claimed that his lower back pain, which radiated to both legs, had been going on as "long as I can remember" and since 1999 (R. 248).

2

Plaintiff did not belong to any clubs or social organizations (R. 249). He did "very little" grocery shopping because "I get out there with people and I just start getting headaches, and I don't want – even to be around people.  I just got to get out there…you know, I just want out of there."  Plaintiff's wife did the yard and house work.  He did not cook anymore, but would "reheat something" (R. 249-250).

Plaintiff claimed to have problems sleeping, waking "up four or five times a night" due to his pain (R. 250). He took naps "a couple times a day" for "at least an hour" and spent whole days in bed because "I just don't feel like getting up".

His lower back pain limits his sitting to approximately 30 minutes before he had to stand up and walk around (R. 250).  Plaintiff could stand about 10 to 15 minutes and walk "20, maybe 25 minutes" (R. 250-251).  When asked how much he could lift Plaintiff claimed, "I have to lift a gallon of milk usually with both hands now" due to pain in his shoulders and "it just puts a lot of pressure … on the rotator cuffs on both sides" (R. 251).  Plaintiff had to take stairs slowly using the handrail; he had problems bending, squatting, pushing, pulling, or operating foot controls (R. 251-252).  He also had problems reaching overhead or straight in front of him, especially "if I get it out too far away from my body, but it just…it's down.  I lose things out of my hand" (R. 252).  His hands had trouble opening and holding onto things.  He described once using a hammer and "I get maybe two hits and I'll lose the hammer out of my hand … I have tingling, and I don't have the strength I used to have."  His pain and problems are alleviated by "laying down, and sleeping…with a wedge under my back and neck" (R. 251).

Plaintiff did not believe he would be able to work in a position with a sit/stand option in which he was performing the measuring or inspecting aspect of his past work because of his weakened grip, lack of feeling in his fingers and the possibility of dropping tools (R. 253).

### 2.    Medical Evidence

The medical evidence is set out in greater detail than usual because the significant omissions in ALJ Jones' decision. The portions referred to by Judge Jones are set out in boldfaced type and the remainder in regular type.[1]

A December 2, 1997, MRI exam of the right shoulder showed osteoarthritis at the right acromioclavicular joint and no evidence of a rotator cuff tear (R. 105).

**A January 3, 1998, MRI exam of the cervical spine showed mild age-related degenerative changes and a very small right paracentral C5-6 disc herniation (R. 104). The exam indicated mild bony spurring along the C5 and C6 vertebral bodies and slight posterior element hypertrophy at C5-6, C4-5 and C6-7.**

**On February 10, 1999, Gavin Awerbuch, M. D. evaluated Plaintiff's neck, right shoulder, arm pain and numbness (R. 203).** Plaintiff reported that his symptoms began in October 1994 after falling backwards with his right arm behind his back at work. **Since injury Plaintiff had experienced numbness and tingling in his hands, reduced grip strength, intermittent neck spasms** and continued pain in his neck and shoulder which worsens if his used his arm above his shoulder, reached behind, or attempted to lift more than 5 to 10 pounds.

---

[1]This is not to suggest that an ALJ need refer to or analyze all medical data in the record. This is not required. In order to fully and fairly develop the record and make adequate findings, the ALJ "does not have to discuss every piece of evidence presented." *Miller v. Shalala,* 8 F.3d 611, 613 (8th Cir. 1993); *Barrett v. Barnhart,* 355 F.3d 1065, 1068 (7th Cir. 2004)(While not required to discuss every piece of evidence, an ALJ should discuss evidence that, if believed, could lead to a finding of disability.). But in this case the contrast of what is reported and omitted demonstrates a far more substantial and consistent treatment supportive of Plaintiff's claims and his credibility than the ALJ decision would indicate. The contrast also indicates a bias on the part of ALJ Jones on the evidence he selects to report and that which his decision ignores.

4

Exam notes indicate Plaintiff saw Dr. Das and underwent surgery for tennis elbow in 1998. When pain persisted, Plaintiff was told that a nerve collapsed and that he had scar tissue in the scapula. **Dr. Awerbuch noted an indentation over the right medial epicondyle. Upon examination Dr. Awerbuch determined Plaintiff suffered from post-traumatic right shoulder pain with internal derangement and probable rotator cuff pathology and slap lesion; right medial epicondylitis, status-post surgery with chronic ulnar neuropathy; post-traumatic neck pain with persistant muscle spasms; and C5-6 disc herniation (R. 204).** Plaintiff also had reduced range of motion in his right shoulder and sensory loss over the 4th and 5th digits of the right hand. Dr. Awerbuch recommended an MRI of the right shoulder and EMG, referred him to an orthopedic surgeon. **He prescribed Celebrex**, advised him to limit activities to tolerance, and instructed Plaintiff not to return to work at this point.

On March 22, 1999, Plaintiff saw Dr. Awerbuch for ongoing problems with his neck and bilateral shoulder pain (R. 199). Plaintiff complained of pain over the medial and lateral elbow and numbness in the forearm and hand. Dr. Awerbuch reviewed the MRI films and now diagnosed right lateral as well as medial epicondylitis, status post surgery with incomplete recovery; ulnar neuropathy; internal derangement of the right shoulder with partial rotator cuff tear and impingement syndrome; and cervical herniated disc with right C-5 radiculopathy. Plaintiff informed Dr. Awerbuch that he would like something besides Celebrex for the pain, that he was very limited in his activities, very frustrated with no improvement in over a year and was considering further surgery. **Dr. Awerbuch also performed nerve conduction studies on selected motor and sensory nerves of Plaintiff's upper limbs, which showed tardy right ulnar neuropathy and right C-5 radiculopathy (R. 200).** Dr. Awerbuch renewed Plaintiff's Celebrex prescription and added Ultram for the pain and Berocca Plus vitamins to help with

nerve regeneration (R. 199).  He also discussed conservative versus surgical management, as well as alternative options, such as acupuncture, acupressure, and magnet therapy.  Plaintiff stated "he would try anything to relieve the pain" and wanted to return to get his pain under control.  Dr. Awerbuch limited Plaintiff's activities to tolerance and scheduled a follow-up visit.

**On April 6, 1999, orthopedic surgeon Dr. Jerome Ciullo concluded that Plaintiff suffered from A/C joint arthritis in his right shoulder, positive SLAP lesion test, glenohumeral instability and overuse of neck and elbow muscles to compensate (R. 106). Dr. Ciullo noted that Plaintiff demonstrated tenderness over the anterior aspect of the A/C joint with limited motion and had absolutely no motion at the end of the clavicle.**  Five of five times, an apprehension maneuver caused a click in the shoulder from external rotations towards internal rotation, which implicated a superior anterior labral detachment (R. 106-107)**. X-rays revealed an ossicle above the glenoid, which can correlate with a slap lesion, bone on bone contact at the A/C joint, major arthritis, and a Type II curve of the acromion (R. 107).  Dr. Cuilio also read an MRI that Plaintiff brought with him that was conducted on February 2, 1999, which showed a supraspinatus midportion increased signal activity showing impingement at the musculotendinous junction and sever A/C joint arthritis.  Dr. Cuilio recommended Plaintiff receive an Athrogram, take medication and undergo physical therapy depending on the results of the test, lose weight and return for an evaluation after the test.**  Dr. Cuilio considered diagnostic arthroscopy and then possibly arthroscopy to remove bone spurs; opening up the A/C joint; reattaching the biceps tendon base; SLAP lesion; possibly shrinking the joint capsule; and open surgery to fix any hole in the rotator cuff that is discovered.  Dr. Cuilio suspected a detached bicep tendon due to a fall onto an outstretched arm, which directly correlated with Plaintiff's description of his injury **and he sent**

**Plaintiff for a CT/arthrogram to determine if there was such a SLAP lesion** (R. 108)**.**

On May 3, 1999, Dr. Awerbuch saw Plaintiff for a follow-up exam and determined Plaintiff had a right rotator cuff derangement, cervical herniated disc, right medial epicondylitis, and right ulnar neuropathy (R. 198). Plaintiff complained of pain in his neck, right shoulder, and arm, and pain in the medial epicondyle with intermittent numbness of his hands. Plaintiff stated his primary goal was to return to work and he wanted surgery to fix his shoulder so he could. He wanted to work another 20 years or at least 10 years before he retired. Plaintiff received acupuncture and had ten trigger points identified, needled and electrically stimulated for 20 minutes. Dr. Awerbuch noted Plaintiff was not responding to conservative care and would like to proceed with surgery. Plaintiff's prescriptions were renewed and a follow-up visit was scheduled.

On May 10, 1999, Plaintiff complained to Dr. Awerbuch of pain in his neck, right shoulder and elbow (R. 197). Plaintiff had 12 trigger points needled with electric stimulation for approximately 30 minutes with good results. Plaintiff stated the medications were helpful. Dr. Awerbuch ordered a trial of Berocca Plus vitimins and continued Plaintinff on anti-inflammatory and pain medication and recommended he wear a right elbow pad. Dr. Awerbuch's impressions were unchanged from his previous diagnosis and a follow-up exam was scheduled.

On May 17, 1999, Plaintiff informed Dr. Awerbuch that he "cannot live with the pain the way it is" and that his activities are very limited (R. 196). Plaintiff complained of intermittent spasms, crepitations, cracking and popping of the cervical spine and when he gets knots his wife must rub out his back. Dr. Awerbuck noted Plaintiff had reduced lumbar range of motion, limited abduction and internal rotation, muscle and periscapular spasms, pain with right shoulder movement, and a positive SLAP lesion. Plaintiff was awaiting surgery and was reluctant to take

any oral medications.  Dr. Awerbuch continued the Berocca Plus vitamins and added at trial of Lac-Hydrin cream for his neck, shoulder and elbow as needed.  Plaintiff had 12 trigger points needled and electrically stimulated for 25 to 30 minutes, which seemed to relieve some of the pain and spasms.  Plaintiff's activities were limited to tolerance and a follow-up visit scheduled.

On May 24, 1999, Plaintiff returned to Dr. Awerbuch, who found Plaintiff suffered from post-traumatic neck, shoulder and elbow pain (R. 194).  Plaintiff had 12 trigger points needled and electrically stimulated for 30 minutes.  Plaintiff stated that the treatments significantly relieved his pain for 4 to 5 days.  Dr. Awerbuch kept Plaintiff off work and limited activities to tolerance, continued the Berocca Plus vitamins and Ultram and gave him a small number of Tylenol #3 for breakthrough pain as needed.

On July 5, 1999, Dr. Awerbuch reviewed with Plaintiff the results from Dr. Ciullo and noted surgery on his right shoulder was scheduled in "either September or October or as soon as he can get in" (R. 193).  Plaintiff complained of continued pain in his neck and radiating down the right arm, associated with numbness.  Exam notes indicated Plaintiff was developing weakness and atrophy of the right shoulder girdle muscles.  Dr. Awerbuch suggested Vicoprofen for Plaintiff's occasional sever breakthrough pain, scheduled a follow-up visit in two months, and instructed him to limit activities to tolerance and remain off work.

On July 26, 1999, Plaintiff returned to Dr. Awebuch for pain in his neck, right shoulder and elbow (R. 192).  Plaintiff stated his elbow pain had worsened and that he had been wearing an elbow support.  He said driving seemed to aggravate the pain and he had to rest his elbow on a pillow.  Exam notes indicated Plaintiff had a cervical herniated disc, right rotator cuff tear, tendonitis and impingement, and tardi right ulnar neuropathy with medial epicondylitis. Dr. Awerbuch outlined various treatment options, but noted he would see how Plaintiff progressed

8

after his right shoulder surgery.  Dr. Awerbuch recommended that weight loss before surgery would aid recovery and outlined some exercises.  Plaintiff had 12 trigger points needled and electrically stimulated to break up some of the spasms.  Plaintiff was to continue to use Vicoprofen and Lac-Hydrin ointment.

On August 2, 1999, Plaintiff complained to Dr. Awerbuch of problems with his right shoulder and arm, elbow pain and numbness of his hands (R. 190).  Dr. Awerbuch found tenderness over the right elbow and sensory loss over the ulnar nerve distribution and noted that after Plaintiff's shoulder surgery he may need a referral to a neurosurgeon regarding his neck. Plaintiff had 14 trigger points needled and electrically stimulated.

On August 30, 1999, Plaintiff saw Dr. Awerbuch for pain in his neck, right shoulder, arm and elbow (R. 189).  Plaintiff had lost 10 pounds for surgery and stated his pain was stable as long as he limited activities.  Plaintiff had 12 trigger points dry needled and electrically stimulated for 30 minutes.  Dr. Awerbach noted his shoulder surgery was scheduled and that he may also need cervical surgery.  Plaintiff received neck exercises and was instructed to limit activities to tolerance and to use an elbow pad to protect the ulnar nerve and epicondyle.  Dr. Awerbach provided an "off work slip" and recommended Plaintiff apply for total and permanent disability because he doubted there was any work Plaintiff could do on a regular and sustained basis because of the various orthopedic impairments.

On October 18, 1999, Plaintiff saw Dr. Awerbach and expressed mixed feelings about his upcoming surgery (R. 188).  Plaintiff he had severe and disabling pain, but was frightened of complications that could arise due to his diabetes.  Plaintiff had lost 13 pounds before surgery and wanted to loose another 5 to 10 more pounds over the next week.  Plaintiff stated he had not been able to work in his garage or do any home activities over the summer months.  Plaintiff had

9

been experiencing severe spasms and pain in his shoulder and said he had to rub his shoulder with a tennis ball against the wall to try to work it out.  Exam notes indicated Plaintiff may need additional surgery on his elbow or neck depending on his response to the shoulder surgery.  Dr. Awerbuch renewed the Tylenol #3 prescription, instructed Plaintiff to stop taking all Motrin and aspirin until after the surgery and limit activities to tolerance, and noted a follow-up exam would be scheduled after surgery.

On October 25, 1999, Plaintiff visited Dr. Awerbuch due to "a great deal of pain in the neck and right shoulder area" and to inquire how long he would "be laid up" after shoulder surgery, which was set for the following Wednesday (R. 187).  Dr. Awerbuch informed Plaintiff it would take at least 6 months to recover, because he would be wearing a chiro-cuff and sling and need aggressive therapy.

After the surgery, Dr. Awerbuch saw Plaintiff on January 24, 2000, for the persistent numbness and weakness of his arm, and **neck and shoulder spasms** (R. 185).  Dr. Awerbuch found Plaintiff had status post right shoulder surgery with incomplete recovery; cervical herniated disc, rule out radiculopathy; and **right ulnar neuropathy**. Dr. Awerbuch recommended an EMG study to see if Plaintiff had developed any progressive nerve damage, a TENS unit trial for pain management and a functional capacities evaluation to objectively determine his abilities and limitations.  **Plaintiff had several trigger points needled and electrically stimulated for 30 minutes.**  Plaintiff received a renewed prescription for Tylenol #3 and scheduled a follow-up in one month.

The January 24, 2000, electromyography report revealed that Plaintiff had chronic/stable right C6 radiculopathy and ulnar neuropathy (R. 186).

10

On February 7, 2000, Plaintiff saw Dr. Awerbuch and complained of a sharp, pinching pain in his shoulder (R. 183).  Exam notes indicated Plaintiff was still receiving therapy for his shoulder and was making a fairly good recovery two months post surgery.  Plaintiff had 6 trigger points needled with electric stimulation.  Dr. Awerbuch renewed Plaintiff's Vicodin and advised him to continue physical therapy and limit activities to tolerance.

On February 21, 2000, Dr. Awerbuch examined Plaintiff and found that the range of motion in his shoulder was increasing, but he still had extreme pain with movement (R. 182).  Plaintiff had ongoing neck pain and right elbow pain with parestesias.  Plaintiff had not received the TENS unit yet.  Surgery for his neck or elbow was discussed, but Plaintiff stated he would prefer to wait until he had recovered from his shoulder surgery first.  Dr. Awerbuch instructed him to continue physical therapy and limit activities to tolerance.

On March 13, 2000, Dr. Awerbuch noted Plaintiff had incomplete motion in his right shoulder and trouble reaching behind or above (R. 181).  He informed Plaintiff that it may take at least a year to fully recover from his shoulder surgery and that other diagnosis may be contributing to his pain and he would need further assessment by a neurosurgeon.  Plaintiff had 12 trigger points needled with electrical stimulation.  Plaintiff was instructed to follow his home exercises, limit activities to tolerance and continue on pain medication.

On March 20, 2000, Dr. Awerbuch noted that Plaintiff showed some improvement from physical therapy, but he was still symptomatic (R. 180).  Plaintiff was concerned his disc may be the cause of major problems and he was considering another cervical MRI or surgical referral depending on his recovery.  Plaintiff had multiple trigger points needled with electrical stimulation.  Dr. Awerbuch scheduled a follow-up visit and instructed him to continue physical therapy, use pain medications symptomatically, and limit activities to tolerance.

11

On June 5, 2000, Plaintiff complained to Dr. Awerbuch of pain in his neck and right shoulder with knots and spasms (R. 178).  Plaintiff stated he is doing exercises and building up his muscles, but his activities were limited because of increasing problems over the right lateral epicondyle and wrist.  Dr. Awerbuch discussed the natural course of Plaintiff's herniated disc, surgery and tennis elbow, ordered a right tennis elbow strap, and noted the possibility of follow-up EMG studies. Plaintiff had 12 trigger points needled with electrical stimulation for 30 minutes and was instructed to limit activities to tolerance.

On June 12, 2000, Plaintiff complained of intermittent right elbow pain, neck spasms and neck pain radiating into the shoulder, down the arm and into the forearm and hand (R. 175). Plaintiff stated he got deeps spasms and knots and his wife massaged his neck and back daily. On exam Plaintiff had a large amount of spasm in the neck, shoulder and peri-scapular area.  Dr. Awerbuch found Plaintiff had weakness of the deltoid and bicep muscle, reduced grip strength due to the elbow pain and his right triceps slightly reduced. Dr. Awerbuch recommended an EMG and noted he made need a follow-up MRI of his cervical spine or a neurosurgical referral. Dr. Awerbuch prescribed Soma as a muscle relaxer, scheduled a follow-up visit and advised Plaintiff to limit activities to tolerance.

**A June 12, 2000, electromyography report showed Plaintiff had right C-6 radiculopathy (R. 174 & 177).**

On June 19, 2000, Dr. Awerbuch administered a cortisone injection to the right shoulder (R. 173). Plaintiff had 12 trigger points needled and electrically stimulated.  Dr. Awerbuch scheduled a follow-up visit and recommended Plaintiff do home exercises for the days he is not in therapy, including wall walking and use of a broomstick to improve range of motion.

On January 2, 2002, Dr. Awerbuch's exam notes indicate Plaintiff missed his last few

12

appointments due to insurance problems, but that Plaintiff had contacted him several weeks prior for severe neck pain and Dr. Awerbuch called in a Tylenol #3 prescription (R. 169). Plaintiff stated he had been using Tylenol #3, but it would only relieve pain for a few hours and it had not helped. Plaintiff stated the pain was so limiting he could not do any household activities and expressed interest in getting OxyContin to use at night to get enough sleep. Dr. Awerbuch noted Plaintiff had lost a considerable amount of weight and that during the exam Plaintiff's neck cracked and popped when it was turned to the right side. Dr. Awerbuch suggested an EMG, with the possibility Plaintiff may need ulnar nerve decompression and a follow-up MRI. Dr. Awerbuch prescribed a low-dose of OxyContin, explained side effects and suggested a bowel regimen.

**A January 2, 2002, electromyography report indicated Plaintiff had right ulnar neuropathy at the elbow and right C-6 radiculopathy (R. 170).**

**On February 11, 2002, Dr. Mark Nuemann, D.O. diagnosed Plaintiff with rotator cuff syndrome, carpal tunnel syndrome, history of C-5/C-6 prolapse on right side, mild hypertension, diabetes mellitus - oral control (R. 212).** Plaintiff complained that he did not really sleep and awoke with pain during the night. He also stated that his lifestyle was affected and he sat in a chair and watched a lot of television and could not reach his shoulder above 90 degrees and could not comb his hair or reach his wallet due to his shoulder symptoms. Physical examination confirmed the decreased range of motion and pain in his right shoulder such that Dr. Neumann opined there was no way Plaintiff could reach to comb the back of his hair.

A February 25, 2002, exam by Dr. Awerbuch revealed that Plaintiff could not raise his arms above shoulder level and had trouble lifting, pushing and pulling (R. 168). Spurling's test was positive producing pain that radiated into the right shoulder and arm. Plaintiff had

incomplete motion of his right shoulder and restricted cervical range of motion.  Plaintiff again noted trouble sleeping and fatigue during the day.  While the OxyContin had worked well and Dr. Awerbuch recommended regular use to maintain serum level, he only used it at bedtime because he was afraid of being impaired by the medicine if he took the daytime dose.  Dr. Awerbuch limited Plaintiff's activities and stated he should avoid any overhead work, pushing, pulling, grasping, torquing, power tools and limit weights to not more than 3-5 pounds (R. 168). Dr. Awerbuch noted a lot of trigger points and spasms and recommended Plaintiff try a Theracan instead of using a tennis ball against the wall.

On March 4, 2002, Plaintiff visited Dr. Awerbuch for his ongoing neck, shoulder and elbow pain (R. 167).  They reviewed the results of the EMG again, and Plaintiff stated he was not really interested in further surgical intervention. **The OxyContin used only at bedtime "works very well" allowing him to sleep through the night. He took no pain medication during the day.**  After Plaintiff had 12 trigger points needled with electrical stimulation, he stated it had reduced his acute pain by about 50%.  Dr. Awerbuch scheduled a follow-up in 3 months and recommended Plaintiff continue his exercise program and wear an ulnar nerve splint as needed.

Instead of 3 months later, Plaintiff saw Dr. Awerbuch one week later on March 11, 2002. Plaintiff reported a large knot in his shoulder that his wife must rub out and ongoing shoulder and elbow pain that limits the use of his right arm (R. 166).  At times the pain was so overwhelming he had to lie down or rub it with a tennis ball against the wall.  Plaintiff complained of waking up several times a night with pain, which caused him to nap because of fatigue.  Dr. Awerbuch found Plaintiff had status-post right shoulder surgery with incomplete recovery; right lateral epicondylitis; cervical radiculopathy and disc disease; regional myofascial

14

pain syndrome; and pain related insomnia and fatigue. Plaintiff had several trigger points needled with electrical stimulation for 30 minutes. Dr. Awerbuch recommended a Theracane, stated Plaintiff must rest and lay down as needed, and advised him against driving or dangerous activities if fatigued (R. 166). Dr. Awerbuch continued OxyContin and prescribed Lidoderm and Sonata and discussed diet for weight loss, with follow-up in several months or as needed.

On April 8, 2002, Plaintiff complained of continued pain in his neck and shoulder, and arm pain and weakness (R. 164). Plaintiff stated his pain was so severe at times that he could not think straight and had to lie down on a daily basis. Plaintiff said the OxyContin did control his pain, but produced impairment. Plaintiff had trigger point therapy for 30 minutes. Dr. Awerbuch continued the OxyContin, prescribed Bextra as an anti-inflammatory and limited his activities to tolerance. Exam notes indicated Dr. Awerbuch did not feel Plaintiff was capable of gainful employment on a regular and sustained basis because of his pain and fatigue.

**On April 12, 2002, Dr. Mark Neumann, Plaintiff's primary care physician since 1989 (R. 65, 111) examined Plaintiff and determined he suffered from rotator cuff syndrome, carpal tunnel syndrome, known history of C-5, C-6 prolapse on the right side, mild hypertension, and diabetes oral control (R. 109).** Exam notes indicate Plaintiff reported being injured on November 24, 1997, when he fell back on his right shoulder while working at GM, and that Dr. Chuillo (Cuilio) had performed arthroscopic surgery and rotator cuff repair. Plaintiff had two other pinched nerves and carpel tunnel and could not raise his shoulder higher than 90 degrees, preventing him from being able to brush his own hair or reach into his wallet.

**On April 13, 2002, Martha Pollock, M.D., on behalf of the Disability Determination Service (DDS), reported that Plaintiff had diminished range of motion in his right shoulder and slightly diminished grip in his right hand (R. 115). Plaintiff complained of pain in the**

15

right shoulder and elbow and diabetes (R. 112).  Dr. Pollock found no joint instability, enlargement or effusion, but noted that Plaintiff's grip strength on his right hand was reduced to 70% (R. 113). Plaintiff demonstrated decreased range of motion in his cervical spine and shoulder (R. 114).

On April 15, 2002, Plaintiff saw Dr. Awerbuch and stated that his blood sugar was fluctuating; he had neck, elbow, shoulder and thoracic back pain, and tingling and numbness in his hand (R. 164).  Plaintiff stated his back spasms were severe and he had to lean against the wall and rub them out with a tennis ball.  He said his pain was disabling and he frequently had to lie down.  Plaintiff received 30 minutes of trigger point therapy.  Dr. Awerbuch ordered a Theracane, continued him on OxyContin, outlined stretching and home exercises and instructed Plaintiff to limit his activities and wear his carpel tunnel strap.

On April 22, 2002, Plaintiff saw Dr. Awerbuch for pain in his elbow, neck and shoulders, with severe knots and spasms (R. 163).  He stated his blood sugars have been better controlled and that he was not sleeping well.  Plaintiff received trigger therapy.  Plaintiff declined a referral to The Pain Clinic for injections.  Dr. Awerbuch renewed OxyContin and prescribed Remeron for sleep.

April 22, 2002, blood results showed Plaintiff had an abnormally high glucose of 348, while a normal range is between 70-105 MG/DL, and abnormally high cholesterol, triglycerides, and LDL cholesterol (R. 139).

On May 3, 2002, the state consultant, Robert H. Digby, M.D., reviewed the evidence and completed a Physical Residual Functional Capacity which led to the initial DIB denial on July 2, 2002 (R. 30).  Dr. Digby determined Plaintiff was limited to: lifting and carrying 20 pounds occasionally and 10 pounds frequently; no overhead use in right arm; occasional overhead

16

reaching; frequent handling with the right arm; standing and/or walking about 6 hours in an 8-hour workday; sitting about 6 hours in an 8-hour workday; and limited pushing and/or pulling limited in the upper extremities (R. 120-121).

On June 12, 2002, Plaintiff complained to Dr. Awerbuch of right shoulder pain and requested an injection (R. 162). Plaintiff still had spasms and knots in his neck and shoulder area and had been experiencing pain in his buttocks that radiated down the right leg into his foot. He stated he had the pain for a number of years, but that recently his right leg was going numb. Dr. Awerbuch found Plaintiff had: chronic right shoulder pain with supraspinatus tendonitis; right leg sciatica; history of cervical herniated disc with right C-6 radiculopathy; history of right ulnar neuropathy; and diabetic neuropathy. Plaintiff received trigger therapy and an injection to his right shoulder. Dr. Awerbuch noted he would hold off any back evaluation until the next visit.

A June 12, 2002, blood test showed Plaintiff had an abnormally high glucose level of 344, while a normal range is between 70-105 MG/DL (R. 134).

On June 17, 2002, Plaintiff visited Dr. Awerbuch to request another injection in his right shoulder due to pain over the suprascapular notch and sharp stabbing pain in the right shoulder blade (R. 161). Dr. Awerbuch performed a right suprscapular nerve block and discussed the use of Botox to help with the cervical dystonia and shoulder spasms.

On June 24, 2002, Dr. Awerbuch administered four trigger point injections for Plaintiff's pain and spasms in his right shoulder blade (R. 159). He recommended a carotid Doppler to rule out stenosis because of Plaintiff's periods of dizziness and lightheadedness. Dr. Awerbuch prescribed Androgel, recommended Plaintiff continued stretching and exercising and scheduled a follow-up visit.

17

**On June 25, 2002, Jama Hammoud, M.D. diagnosed Plaintiff with Type II diabetes mellitus, not well controlled, and hypertension (R. 130). Dr. Hammoud advised Plaintiff to use insulin injections to control his blood sugar, prescribed Lanus, stopped the Avandia, kept him on Glucophage and Amaryl and recommended an appointment in 6 weeks.**

On July 1, 2002, Plaintiff was awaiting his Theracane and was still waiting to hear about Botox injections to relieve the severe spasms (R. 158). Dr. Awerbuch noted in his exam plan that Plaintiff's severe muscle spasms were disabling and he must lie down frequently during the day.

On July 22, 2002, Dr. Awerbuch administered a right suprascapular nerve block to relieve Plaintiff's severe shoulder pain (R. 156). Upon exam, Dr. Awerbuch found Plaintiff had: chronic right shoulder pain with severe muscle spasms; cervical disc disease with radiculopathy and dystonia; right medial epicondylitis and ulnar neuropathy; chronic low back pain with radiculitis; possible diabetic neuropathy; and suprascapular neuropathy. Plaintiff received 30 minutes of trigger therapy. Dr. Awerbuch stated he would consider EMG studies to rule out diabetic neuropathy or radiculopathy to account for his back pain and foot and leg numbness. Plaintiff was instructed to continue home exercise and using OxyContin (R. 156-157).

On July 29, 2002, Plaintiff saw Dr. Awerbuch and informed him that he received the Theracane and was using it to massage his trigger points (R. 155). **His use of OxyContin at bedtime was "very helpful."** Yet, Plaintiff was concerned about his excessive sleepiness, and unlike the March 4 report (R. 167), how he could not sleep during the night and woke up several times. **Plaintiff stated he would like to exercise at a local health club with light weights to build himself up,** but that pain prevents him from activity. Plaintiff received trigger therapy. Dr. Awerbuch recommended a polysomnogram and suggested a heath club membership.

18

On August 9, 2002, Plaintiff visited Dr. Awerbuch for his ongoing pain and numbness and wanted to switch pain medications (R. 150). Dr. Awerbuch switched Plaintiff from OxyContin to a Duragesic patch and administered three trigger point injections. Plaintiff also received PENS treatment for about 30 minutes.

On August 26, 2002, Plaintiff saw Dr. Awerbuch for muscle spasms in his shoulder, pain in his neck, shoulder and right arm, and numbness of his 4th and 5th digits (R. 151). Dr. Awerbuch noted that Plaintiff's feet going numb related to his diabetes. Plaintiff received a right supraspinatus tendon injection and trigger therapy for about 20 minutes. Dr. Awerbuch recommended an EMG of his lower extremities and a Botox injection for his neck and shoulder.

**An August 26, 2002, electromyography report indicated Plaintiff had peripheral polyneuropathy of the axonal type and right L5 radiculopathy (R. 152).**

On October 7, 2002, Dr. Awerbuch administered four trigger point injections to Plaintiff's right shoulder, increased his Duragesic and recommended a bowel regimen (R. 148-149). **Plaintiff was experiencing sustained relief with Duragesic to the point he was more functional during the day and sleeping better at night,** but still stated he still had back pain and intermittent radiation down his leg which limited his ability to stand, walk or lift. Dr. Awerbuch noted Plaintiff's continued need to sit or lie down during the day. He estimated he could only stay in one position for 10 minutes. Dr. Awerbuch's physical examination left him with the following clinical impressions: cervical herniated disc with right C-6 radiculopathy, status-post right shoulder surgery with persistent trigger points and spasms, right suprascapular neuropathy, diabetes with diabetic polyneuropathy, chronic low back pain with lumbar disc disease and right radiculopathy, obstructive sleep apnea with daytime fatigue. Plaintiff received four trigger point injections, which produced good relief, and his Duragesic prescription was

increased.

At an October 14, 2002, exam Plaintiff's pain was doing much better and he had no fatigue or side effects (R. 147). He still had knots in his shoulder and neck and back pain. Physical examination revealed decreased lumbar range of motion, positive straight leg test, marked spasms and trigger points in right periscapular area, positive Tinel's sign in right elbow, reduced grip, sensory loss over ulnar distribution and depressed bicep reflex. Dr. Awerbach advised Plaintiff to limit his home activities and stated that he was not capable of gainful employment due to his "multitude of medical and neurological problems".

At a November 4, 2002, follow-up examination Plaintiff reported that he was more comfortable and tolerable and able to function at a higher level around his house (R. 146). He still experienced spasms and knots in his right shoulder and neck and back pain. He reported leg paresthesias, elbow pain, grip weakness and an upper respiratory infection. A November 11, 2002, exam found Plaintiff's condition unchanged.

On November 25, 2002, Plaintiff reported pain in his neck and shoulders, with more pain, spasms and swelling on his left side (R. 144). He was still experiencing numbness and tingling in his legs and was "very limited in his activities." His medication, Duragesic, was causing fatigue which prevented him from driving. Examination confirmed "marked spasms over the neck and shoulder area bilaterally" and severe trigger points over both trapezii. Dr. Awerbach advised Plaintiff to continue using his ulnar nerve brace and prescribed Arthrotec and Skelaxin. Dr. Awerbach opined that Plaintiff should limit his activities and urged him to do isometric exercise and join a health club to do aqua therapy. PENS therapy was performed.

On December 16, 2002, Plaintiff reported experiencing a lot of pain and spasms in right shoulder, ongoing back and leg pain, leg numbness, difficulty sleeping, night sweats and

recurring respiratory infection (R. 143).  Dr. Awerbach diagnosed status post-right shoulder surgery with incomplete recovery and severe muscle spasms, cervical herniated disc with radiculopathy, ulnar neuropathy, diabetic neuropathy and lumbar herniated disc with radiculopathy.  Plaintiff received electroaccupuncture, prescriptions for Duragesic and Botox and was advised to limit his activities. **He received the first Botox injection for his shoulder spasms on December 23, 2002 (R. 142).**

On January 13, 2003, Plaintiff received another Botox injection and Plaintiff reported that the last injection had helped to break up the muscle spasms (R. 141).  On March 17, 2003, Plaintiff reported that the Botox injections helped to relieve the spasms considerably.  Plaintiff asked about a hospital based therapy program and complained of pain in his elbows, wrists, hands low back and shoulders.  He reported numbness in his hands and marked spasms in his neck and shoulders.  Plaintiff received another Botox injection.

**On June 3, 2003, Plaintiff complained of fatigue, loss of energy and weight loss to Dr.  Neumann (R. 208).  Dr. Neumann discussed Plaintiff's diet and reducing Plaintiff's Duragesic and ordered blood tests to rule out hormone imbalance, diabatic changes or narcotic effect as explanations for Plaintiff's symptoms.**

**Plaintiff received Botox injections in his shoulder and neck for continued spasms from Dr. Awerbuch on July 7, and August 8, 2003 (R. 232-33).  He noted the Durgesic worked well to control pain and "function at a fairly high level" (R. 232).**

On January 20, 2004, Plaintiff complained of severe pain in the left shoulder radiating into his neck, pain radiating into right arm and bilateral grip weakness, numbness in his 4th and 5th fingers and erectile dysfunction (R. 227).  Dr. Awerbuch opined that the left shoulder pain could due to overuse compensating for the right shoulder.  An EMG revealed right ulnar

neuropathy and right C-6 radiculopathy (R. 229).  **Dr. Awerbuch recommended an ulnar nerve brace and a cervical spine MRI.**

### 3.    *Vocational Evidence*

The Vocational Expert Paula McEachin testified at Plaintiff's administrative hearing. ALJ Jones asked VE McEachin to consider whether a hypothetical person of Plaintiff's age, then 53, education who had could perform light work with the following exertional limitations could perform Plaintiff's past work: occasional kneeling and no crawling, occasional climbing of stairs, no climbing ladders, only occasional overhead reaching with right arm, frequent but not constant use of right hand and arm for handling and gross manipulating (the "First Hypothetical")(R. 258). VE McEachin responded that the lifting restrictions would be preclusive of Plaintiff's past jobs, but that his tool and die skills would be transferable to some light, semiskilled jobs that such a person could perform (R.  259).  Specifically she testified that there were 1,000 light, semi-skilled tool and die jobs that fit the criteria.  There were no sedentary tool and die jobs.  She also indicated that his skills were transferable to two other semi-skilled, light positions:   4,000 inspection positions and 1,200 positions in production inspection.  There were also unskilled light positions: 1,700 in  information clerking, 2,200 in visual inspecting, 500 in sorting and 5,000 in inspecting (R. 260).

When questioned whether these positions would be reduced if the First Hypothetical limitations were increased to include only occasional gross manipulation with right hand, VE McEachin answered that in the semi-skilled category this would eliminate the tool and die position and reduce the inspector to 1,200 and the production inspector to 500 (R. 261).  The unskilled positions would be reduced because the sorter position would be eliminated and the inspector positions would be at 1,000.

22

VE McEachin testified that were no sedentary positions to which Plaintiff's skills could be transferred that could accommodate the hypothetical limitations, but there were unskilled positions available: 2,000 in video surveillance, 1,200 in information clerking, 1,100 in I.D. clerking and 2,200 in visual inspection (R. 262).

VE McEachin testified that adding a sit/stand option would not effect the number of jobs available.  The addition of a lifting restriction of 5-10 pounds would preclude light work and the addition of requirement of twice daily naps or frequent need to lie down to relieve pain would preclude employment (R. 263).

If the First Hypothetical was changed to add only occasional gripping, grasping, handling, fingering or feeling with the right hand; only occasional reaching away from the body with the right arm, meaning only occasional flexion or extension of the elbow; and only occasional and no prolonged flexion, extension or rotation of the neck, this would eliminate the semiskilled jobs and the unskilled sorter position (the "Second Hypothetical")(R. 264-65).

If the Second Hypothetical was changed to add a limitation for no forceful gripping or grasping and no constant repetitive wrist movements with either hand, this would not affect the remaining unskilled positions, information clerk, visual inspector or inspector (R. 265-66).  If a further limitation for no use of vibrating tools was added, this would also not affect the remaining positions (R. 266).

### 4.    The ALJ's Decision

ALJ Jones determined that Plaintiff had not engaged in substantial gainful employment since the onset of disability and met the special status requirements of the Act through the date of his decision (R. 23).

Plaintiff had the following impairments that were collectively severe within the meaning

of the Regulations: degenerative disc disease of the cervical and lumbar spine; degenerative joint disease of the right shoulder status post arthroscopic repair (10/99); bilateral carpal tunnel syndrome; right epicondylitis, status post surgical repair (1988); diabetes mellitus; hypertension; obstructive sleep apnea; obesity; status post cholecystectomy (1993); and iatrogenic prescription drug dependence (R. 20-21). The impairments did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4 (R. 24).

ALJ Jones found that Plaintiff's allegations regarding his limitations were not fully credible because his allegations were inconsistent with the objective medical evidence which "reveals a normal range of motion in the lumbar spine", the lack of aggressive medical treatment since October 1999 when he was awarded disability by his employer, and Plaintiff's daily activities which include "attending auctions [R. 213] and working in his garage [R.188]. He also wants to join a health club [R. 155]" (R. 22). ALJ Jones also found that Plaintiff's $3,300 monthly income from Worker's Compensation and disability retirement and the availability of narcotic medication provided Plaintiff secondary gain for "exaggerating symptoms and not seeking work".

Plaintiff had a residual functional capacity (RFC) to perform the requirements of light work that involved only occasional(up to 33%) kneeling, no crawling, only occasional climbing of stairs, no climbing ladders, no reaching overhead with the right arm, only occasional gross manipulation with the right hand, no forceful or sustained gripping or grasping, no constant repetitive movements, and no use of vibrating hand tools (R. 24).

Plaintiff was unable to perform his past work, but had skills that were transferrable to jobs within his RFC.

Using the Medical-Vocational Guidelines as a framework for decision making and

24

considering the VE's testimony regarding the number of jobs available, ALJ Jones found Plaintiff not disabled because he could perform a significant number of jobs in the national economy, including semi-skilled work as an inspector and production inspector and unskilled inspector and information clerk.

## II.   ANALYSIS

### A.   Standards of Review

In adopting federal court review of Social Security administrative decisions, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

If the Commissioner seeks to rely on vocational expert testimony to carry her burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant respects.[2] A response to a flawed hypothetical

---

[2] *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-76 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v.*

question is not substantial evidence and cannot support a finding that work exists which the Plaintiff can perform.

### B.      Factual Analysis

Plaintiff challenges the Commissioner's decision and argues that the ALJ's decision was not supported by substantial evidence because the hypothetical question posed to VE McEachin (a.) included limitations different than those in the RFC relied on by ALJ Jones in his opinion, (b.) did not include limitations prescribed by Plaintiff's treating physician and (c.) did not include limitations testified to by Plaintiff's because ALJ Jones failed to properly assess Plaintiff's credibility.

### 1.      *Opinion RFC versus Hypothetical RFC*

Plaintiff correctly points out that the RFC relied on by ALJ Jones in his opinion does not precisely match that which he presented to VE McEachin.  In fact, the RFC in the opinion contains greater restrictions than those presented to VE McEachin.  Yet, ALJ Jones relied on the VE's testimony given in response to the hypothetical posed to her in determining that there were a substantial number of jobs Plaintiff could perform.

The main difference between the RFCs lies in the degree of overhead reaching Plaintiff can do with his right arm.[3]  In the hypothetical posed to VE McEachin, ALJ Jones asked her to consider a person that could perform work involving *occasional* overhead reaching with the right arm (R. 258), but in his opinion he states that Plaintiff has the RFC to perform work involving *no* overhead reaching with the right arm (R. 21, 24).  It is not clear whether ALJ Jones' opinion simply contains a typographical error or he decided to increase the limitations based on a review

_____

*Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

[3] Plaintiff also argues that the RFC in the opinion contains another limitation that was not posed to VE McEachin, no use of vibrating hand tools, but this limitation was presented to the VE (R. 266).

of the evidence, as there is evidence to support a finding that Plaintiff was limited to no overhead reaching.  Given the examples of inspector and information clerk jobs, it is not apparent this error was material.

The lesser error is in regard to the limitation of "no forceful or sustained gripping or grasping and no repetitive wrist movements" that ALJ Jones posed to VE McEachin as an addition to the Second Hypothetical (R. 265).  The Second Hypothetical, even before the addition of this limitation, had eliminated all semi-skilled jobs and reduced the unskilled jobs as follows: visual inspector (2,200), inspector (1,000) and information clerk (1,700) (R. 265-66).   VE McEachin testified that the addition of the no forceful gripping limitation did not further reduce the available unskilled jobs.

ALJ Jones added the limitations of no overhead reaching and no forceful gripping to the RFC in his opinion but then used the semi-skilled and unskilled jobs about which VE McEachin testified in response to the First Hypothetical (with the addition of occasional gross manipulation with right hand) which did not contain these limitations as evidence supporting the finding of non-disability.

Yet the additional limitations of no forceful gripping and no overhead reaching should be considered harmless error because, even if the semi-skilled jobs were eliminated with the addition of such limitations, there would remain a substantial number of unskilled jobs that Plaintiff could perform.  While there is nothing in the record to indicate the numbers of jobs eliminated if the limitation of no overhead reaching is added, it is doubtful that the change from occasional overhead reaching to no overhead reaching would reduce the 4,900 unskilled positions jobs about

27

which VE McEachin testified significantly.[4]

On the current record ALJ Jones' errors on these restrictions does not along warrant a remand.

### 2.    *Treating Physician's Limitations*

Plaintiff argues that the limitations placed on Plaintiff by his treating physician, Dr. Awerbuch, in February 2002 – avoid overhead work, pushing, pulling, grasping, torquing, power tools and lifting over 3-5 pounds (R. 168) – were not properly considered by ALJ Jones. Plaintiff also argues that ALJ Jones failed to consider Dr. Awerbuch's opinion that Plaintiff was disabled from work due to pain and fatigue as of April 8, 2002 (referring to R. 165).[5]

The case law in this Circuit has stated that if adequately supported by objective findings, and if uncontradicted by other substantial medical evidence of record, a treating physician's opinion of disability was binding on the Social Security Administration as a matter of law.[6] The

---

[4]42 U.S.C. § 423(d)(1) defines "disability" as an inability to engage in any "substantial gainful activity" due to an impairment. Under § 423(d)(2)(A) this means an inability to do "substantial gainful work which exists in the national economy" which is defined as "work which exists in significant numbers either in the region where such individual lives or in several regions." The Sixth Circuit held that 1,350 to 1,800 jobs in a nine-county area satisfied this "significant number" requirement. *Hall v. Bowen*, 837 F.2d 272 (6th Cir. Jan. 20, 1988). *Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993), citing various other circuit cases finding 500-1200 "significant."*Allen v. Barnhart,* 357 F.3d 1140, 1145 (10th Cir. 2004); *Trimiar  v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir.1992) (found an occupation base reflecting 650-900 statewide jobs was small enough to put the issue in a gray area requiring a remand in order for the ALJ to address the question a "significant" number of jobs under 42 U.S.C. § 423(d)(2)(A) which the federal courts could then review.)

[5]Both of these opinions were stated before the switch to Duragesic in August 2002 that produced improved pain management.

[6] *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference"); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same); *Bowie v. Harris*, 679 F.2d 654, 656 (6th Cir. 1982); *Allen v. Califano*, 613 F.2d 139, 145 (6th Cir. 1980).

administrative decision could reject a properly supported treating physician's opinion of disability if the record contains "substantial evidence to the contrary." *Hardaway v. Secretary of HHS*, 823 F.2d 922, 927 (6th Cir. 1987). Yet, this law has been slightly modified by administrative regulation to give the Commissioner broader discretion to reject certain treating physician options.

In August 1991, the Social Security Administration adopted a new regulation in response to the treating physician rules adopted by the various circuits. 20 C.F.R. §404.1527 [SSI § 416.927]. While the regulation indicates that the Commissioner will generally give more weight to the opinions of treating sources, it sets preconditions for doing so, which are more strict than those established by the Sixth Circuit. The 1991 regulation also limits the scope of the subject matters on which the Commissioner will give a treating source opinion greater weight.

Under the 1991 regulation, the Commissioner will only be bound by a treating source opinion when it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not  inconsistent with other substantial evidence in your case record." 20 C.F.R. § 404.1527(d) [SSI § 916.927(d)]. *See also* S.S.R. 96-2p. In those situations where the Commissioner does not give the treating physician opinion "controlling weight," the regulation sets out five criteria for evaluating that medical opinion in conjunction with the other medical evidence of record.[7]

_____

[7]    Those five criteria are:
       (1) the length, frequency, nature and extent of the treatment relationship, including the kind and extent of examination and testing sought from specialists or independent laboratories;
       (2) the supportability of the medical opinion based on medical signs and laboratory findings, with better explanations being given more weight, and whether the opinion includes all of the pertinent evidence as well as opinions of treating and other examining sources;
       (3) the consistency of the opinion with the record as a whole;
       (4) specialty, with greater weight given to relevant specialists;
       (5) and other factors which tend to support or contradict the opinion.
20 CFR 404.1527(d).

The regulation also limits the subjects upon which the Commissioner must defer to a treating source opinion on "the issue[s] of the nature and severity of your impairment[s]."  20 C.F.R. § 1527(d)(2), [SSI § 916.927(d)(2)].  Under 20 C.F.R. § 404.1527(e) [SSI § 916.927(e)], the Commissioner will not defer to treating source opinions on certain subjects that are "reserved to the Secretary" which includes treating physician opinions on a claimant's disability under the Listing, on residual functional capacity or a general and conclusory statement of disability or inability to work, such as Dr. Awerbuch's April 8, 2002, statement (R. 165).

Thus, while deferring in part to the court-created "treating physician rule," the Commissioner's 1991 regulation in large measure rejects circuit case law that gives enhanced weight to treating physician opinions regarding disability under the Listing, on residual functioning capacity, or on general statements of disability.

In 20 C.F.R. 404.1513(b) &(c) [SSI § 416.913 (b) &(c)] and SSR 96-5p the Commissioner distinguishes between a treating source "statement about what [a claimant] can still do despite . . . impairment(s)" and the formal administrative finding on "residual functional capacity."  The former is a physician's opinion on either physical or psychological capacities for work related activities.  The former, when based on the medical source's records, clinical and laboratory findings, and examinations can be considered a "medical opinion" under § 404.1527(a)(2) [SSI § 416.913(a)(2)] because "what [ a claimant] can still do despite impairment(s)" and "physical or mental restrictions" are medical judgments about the nature and severity of [a claimant's] impairment(s)" and thus fall within the Commissioner's definition of "medical opinion."  Yet, because these medical opinions are different from the formal findings under § 404.1527(e) [SSI § 416.913(e)] on "disability" and on "residual functional capacity" – which are subjects reserved to the Commissioner and which may be based on additional evidence in the record – the

30

Commissioner need not defer to the treating source opinion except in the narrow case where the treating source opinion is to be given controlling weight under 20 C.F.R. §1527(d)(2) [§ 416.927(d)(2)], *i.e.* the treating sources' opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."

Thus, ALJ Jones need not have deferred to Dr. Awerbuch's determination that Plaintiff was disabled, and some might argue he also was not required to defer to Dr. Awerbuch's medical opinion about what he could still do despite his impairments as not "well supported by medically acceptable clinical and laboratory diagnostic techniques."  What is clear is that Dr. Awerbuch's opinion is not contradicted by substantial evidence in the record.  To the contrary it is also clear that ALJ Jones' decision does not refer to a substantial number of clinical exams which support Dr. Awerbuch's opinion.  It appears Dr. Awerbuch's medical reports and his opinions were not given full and fair consideration.  Nor are sufficient reasons stated for discounting that evidence or Dr. Awerbuch's opinion.  Non-treating, non-examining, DDS physician Dr. Digby's May 2002 opinion is insufficient evidence to counter evidence from a long-term treator.

In the present case, as noted from the presentation of the medical evidence above, ALJ Jones' decision does not appear to acknowledge or credit substantial portions of Dr. Awerbuch's clinical reports.  He makes no mention of 36 reports by Dr. Awerbuch: March 22, 1999; April 3, 1999; May 10, 1999; May 17, 1999; May 24, 1999; July 5, 1999; July 26, 1999; August 2, 1999; August 30, 1999; October 18, 1999; October 25, 1999; February 7, 2000; February 21, 2000; March 13, 2000; March 20, 2000; June 5, 2000; June 12, 2000; June 19, 2000; January 2, 2002; February 25, 2002; March 11, 2002; April 8, 2002, April 15, 2002, April 22; 2002; June 12, 2002; June 17, 2002; June 24, 2002; July 1, 2002; July 22, 2002; August 9, 2002; August 26, 2002;

31

October, 14, 2002; November 4, 2002; and November 25, 2002 (R. 144-199). Of those he does report, Judge Jones seems to select only the portions supporting his position.[8] Furthermore, he seems to summarily discount Dr. Awerbuch's entire professional competence and credibility by suggesting this "doctor he sees for maintenance of his Worker's Compensation claims" is over-medicating Plaintiff with pain medication "despite the risks created for the claimant." (R. 21).

Therefore, it is recommended that this matter be remanded for further fact-finding by an ALJ and an opportunity for Plaintiff to introduce evidence of his current limitations. Upon remand, if Dr. Awerbuch's, or any treating source's, opinion is determined not to be well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record and therefore not given controlling weight, an analysis must be done to determine what weight the opinion should be given using the factors set forth in 20 C.F.R. § 404.1527(d).[9]

### 3.   *Plaintiff's Credibility*

The standard for an administrative law judge's credibility finding is as follows:

> the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on credibility of an individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the

---

[8]For example, the use of the October 7, 2002, report stating the Duragesic was working much better and that "he was doing well, sleeping well, and the pain was controlled" (R. 20, 148-149) and the July 7, 2003, report stating the Duragesic was "helping to control the pain and improving function to a high level" (R. 20, 233).

[9]Also, S.S.R. 96-5p on Medical Source Opinions and S.S.R. 85-16 urge recontacting of treating sources, particularly in instances of questionable severity of impairment or inconclusive RFC, or when medical source notes appear to be incomplete. S.S.R. 96-5p requires "appropriate explanations" for not re-contacting the treater for clarification when needed.

adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision.

S.S.R. 96-7p.

*Felisky v. Bowen,* 35 F.3d 1027, 1039 (6th Cir. 1994), made it clear that the ALJ cannot merely recount the medical evidence and claimant's daily activities and then without analysis summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Id.* at 1039. "The SSA regulations clearly state that this is not the end of the analysis. 20 C.F.R. § 404.1529(c)(2)." *Id.* The ALJ must also consider the claimant's daily activities; the location, duration, frequency and intensity of pain; precipitating and aggravating factors; type, dosage effectiveness and side effects of medication; treatment other than medication; and any other measures taken to relieve pain. *Id.* at 1039-1040.

Because an ALJ can evaluate a Plaintiff's demeanor at the in-person testimony, reviewing courts are limited to evaluating whether or not the ALJ's explanations for discrediting Plaintiff were reasonable and supported by substantial evidence in the record. *Jones v. Comm'r Soc. Security*, 336 F.3d 469, 476 (6th Cir. 2003).

ALJ Jones determined that Plaintiff's allegations were not wholly credible and explained this finding in the body of his decision by referring to what he perceived as discrepancies:

(a.) Plaintiff's full range of lumbar spine motion. This finding was supported only by the non-treating DDS examiner, Dr. Martha Pollack, and was limited to a single record from April 2002

33

(R. 114). There are several records indicating lumbar spasms and less than full range of motion through January 2004 (R. 140-156, 233, 227). It is also significant that this lumbar spine was not a primary problem for Plaintiff compared to his neck, shoulder, and upper extremity limitations.

(b.) Lack of aggressive medical treatment. If by aggressive medical treatment ALJ Jones means surgery, then yes, Plaintiff has refused further surgery. Yet, the record shows that after two operations he has received multiple injections of pain mediation and Botox into his shoulder and neck and taken acupuncture and TENS treatment which ALJ Jones did not address.

(c.) Daily activities including attending auctions and working in his garage. The exhibits ALJ Jones cites in support of these being part of Plaintiff's daily activities do not support a finding that Plaintiff conducts these activities on a regular basis. The auction was referred to in a medical record wherein a treator stated that Plaintiff fell ill at an auction in 2002 (R. 213) and working in the garage was referred to in another medical record in October 1999 wherein Plaintiff complains that his condition has *precluded* him from being able to work in his garage (R. 188). As listed above, there are many records wherein Plaintiff complains of inability to complete activities of daily living and Dr. Awerbuch advises him limit his activities – none of which were analyzed by ALJ Jones in assessing credibility.

(d.) Desire to join a health club. ALJ Jones ignores the fact that Plaintiff's doctor advised him to join the health club as part of treatment to lose weight and increase capacity (R. 155).

The Commissioner's regulation 20 C.F.R. 404.1545 requires consideration of all medical and non-medical evidence, including the claimant's subjective accounts of symptoms, in determining RFC. Yet, subjective evidence is only considered to "the extent...[it] can reasonably be accepted as consistent with the objective medical evidence and other evidence (20 C.F.R. 404.1529(a))." *Duncan v. Secretary of Health & Human Servs.,* 801 F.2d 847, 852 (1986).

34

While the issue of a claimant's credibility regarding subjective complaints is within the scope of the ALJ's fact finding discretion when making a determination of disability, *(Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981); *Jones v. Commissioner of Social Sec.*, 336 F.3d 469, 476 (6th Cir. 2003)), there are limits on the extent to which an ALJ can rely on "lack of objective evidence" in discounting a claimant's testimony.

Subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record that would explain such pain. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986). While the underlying condition must have an objective basis, neither the Social Security Act nor the regulations require a claimant to prove the degree of pain and limitations by objective medical evidence.

While ALJ Jones refers to 20 C.F.R. 404.1529(a) and SSR 96-7p his single paragraph is insufficient to comply with them. His credibility finding is problematic and an unfair reading of the record – the auction, working in garage and mischaracterization of health club membership. Given these mischaracterizations of the record and considering his limited and selective account of Dr. Awerbuch's extensive clinical treatment records that would support Plaintiff's claims, ALJ Jones' credibility finding does not meet the standards of 20 C.F.R. 404.1529(a), SSR 96-7p and *Felisky*.

The remaining question is whether to remand for further proceedings or for an award of benefits. *Faucher v. Secretary of HHS*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), held that it is appropriate for this Court to remand for an award of benefits only when "all essential factual issues have been resolved and the record adequately

35

establishes a plaintiff's entitlement to benefits."  This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Faucher* citing *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

Here, Plaintiff contends his most severe impairments relate to his right shoulder.  There is substantial objective and clinical diagnostic evidence of underlying right shoulder injury with surgery and incomplete recovery as well as cervical herniated disc with radiculopathy, right ulnar neuropathy and lumbar herniated disc with radiculopathy, confirming his diagnosis of an "underlying medical condition" sufficient to meet the first part of the *Duncan* test.[10]

As in most cases, there is no objective evidence of the exact degree of the limiting symptoms of pain, fatigue and limitations.  Thus, the analysis must be "whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  His subjective evidence and consistent reporting to treators over the course of several years is central to this analysis.  Yet, the evidence here is not unequivocal.  The state agency physician, Dr. Digby, concluded in a May 2002 Residual Functional Capacity Assessment form that Plaintiff can perform a limited range of light work (R. 121-124).  While this non-examining physician's opinion is entitled to less weight than a long term treating

---

[10] *Duncan*, 801 F.2d at 853 (6th Cir. 1986), notes "First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  *See also McCormick v. Secretary*, 861 F.2d 998, 1002-1003 (6th Cir. 1988); *see also* 20 C.F.R. § 404.1512 and 416.913(e)(requiring claimants to provide all medical evidence in support of their claims).

36

2:05-cv-72585-GCS-SDP   Doc # 19   Filed 06/21/06   Pg 37 of 38   Pg ID 379

physician,[11] even Dr. Awerbuch notes significant improvement after August 2002 when Plaintiff began treatment with the Duragesic patch.

Thus, on the present record, with the questionable credibility findings and a non-examining state evaluator opinion serving as sole support in contradiction to a treating physician's opinion, there is not substantial evidence to uphold the Commissioner's finding and the decision of the Commissioner should not be upheld.  Yet, under *Faucher*, it cannot be said that Plaintiff meets these requirements for an award of benefits.

Thus, this matter should be remanded for further proceedings consistent with this report. On remand an update from Plaintiff's treators and possibly a consulting examiner on residual functional capacity is appropriate.  Remand will also allow for a more careful credibility assessment consistent with SSR 96-7p, a consistent hypothetical to a vocational expert, explanation of the substantial gap in the medical record between his June 19, 2000, and January 2, 2002, visits, and consideration of a possible closed period of disability.  Given the nature of the errors noted in this report it is further recommended that a different ALJ be assigned on remand.

## III.   RECOMMENDATION

For the reasons stated above, it is Recommended that Defendant's Motion for Summary Judgment be DENIED, Plaintiff's Motion for Summary Judgment be GRANTED and this matter be

---

[11]*Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice.  *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)."); *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (where treating physician's diagnosis and opinion are amply supported by clinical data non-treating physicians' conflicting assessments alone cannot be considered substantial evidence, and Commissioner is encouraged to give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.); *Houston v. Secretary of Health & Human Services*, 736 F.2d 365, 367 (6th Cir. 1984)(a treating physician's opinion is entitled to much greater weight than that of the government's non-treating physician).

REMANDED for further proceedings consistent with this report.  The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Filing of objections, which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local*, 231, 829 F.2d 1370,1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 21, 2006                              s/Steven D. Pepe
Ann Arbor, Michigan                          United States Magistrate Judge


Certificate of Service

I hereby certify that a copy of this Report and Recommendation was served upon the attorneys of record by electronic means on June 21, 2006.

s/William J. Barkholz
Courtroom Deputy Clerk

38